RENDERED: DECEMBER 13, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1293-MR

JOHN SMITH                                                    APPELLANT

v.             APPEAL FROM MONROE CIRCUIT COURT
                HONORABLE DAVID L. WILLIAMS, JUDGE
                ACTION NO. 12-CR-00041-001

COMMONWEALTH OF KENTUCKY                       APPELLEE

OPINION
AFFIRMING IN PART, VACATING IN PART,
AND REMANDING

** ** ** ** **

BEFORE: CETRULO, L. JONES, AND McNEILL, JUDGES.

McNEILL, JUDGE: John Smith ("Smith") was convicted of murder, first-degree robbery, first-degree burglary, and tampering with physical evidence in the Monroe Circuit Court and sentenced to forty-five years' imprisonment. His conviction and sentence were affirmed on direct appeal to the Kentucky Supreme Court. *Smith v. Commonwealth*, No. 2017-SC-000477-MR, 2018 WL 6570795 (Ky. Dec. 13, 2018). Subsequently, Smith filed a motion to vacate the judgment

under RCr[1] 11.42 and requested an evidentiary hearing.[2] The trial court denied the motion without holding an evidentiary hearing. We vacate and remand for the trial court to hold an evidentiary hearing on whether Smith received ineffective assistance of counsel when his counsel failed to investigate a potential alibi witness. We affirm as to all other issues.

## BACKGROUND

The relevant facts, as set forth in *Smith*, 2018 WL 6570795, at *1, are as follows:

> On April 20, 2012, the victim was found dead in her home in the Ebenezer community, Monroe County. Her injuries included a massive head wound and multiple stab wounds. Around the time of the murder, a witness, whose son was the Monroe County Sheriff, noticed a burgundy-colored Chevrolet or Saturn with a cracked windshield or driver's side window parked on the side of the road near the victim's residence. He reported this to his son, who then relayed the information to the investigating detectives. Detective Brooks, the lead investigator, recognized this distinctive car as belonging to Chasity Hagan, a former confidential informant. In addition, the victim's daughter received an anonymous call stating Melinda Webb had committed the crime.

> After an unproductive interview with Webb, the investigation turned to Hagan, who denied any involvement in the murder during an interview at the Tompkinsville Police Department. Upon returning

---

[1] Kentucky Rules of Criminal Procedure.

[2] Smith filed a *pro se* RCr 11.42 motion which was later supplemented by counsel with additional arguments.

Hagan to her home, law enforcement was informed that another person staying at the home, John Smith, had run out the back into the woods. Police chased Smith, detained him, but he also denied any involvement in the murder. An investigation focusing on Smith and Hagan ensued, and eventually Hagan confessed to being at the scene of the murder but stated that Smith was the one who killed Howard, and that he had a stab wound in his stomach from Howard stabbing him with a cane sword discovered at the scene. Investigators searched Hagan's car, found pill bottles with Howard's name on them, a pair of men's and women's jeans, and a bloody axe handle. Other evidence was found inside the Hagan home.

During the months that followed, Hagan gave at least six different accounts of what occurred on the day of the murder. Prior to trial, Hagan entered into a plea agreement with the Commonwealth in exchange for her testimony against Smith at trial. Hagan testified that she and Smith needed money to buy drugs. They first attempted to get a title loan in Tennessee to purchase the drugs, but that plan failed. Once back in Kentucky, they devised a plan to steal drugs from homes along Ebenezer Road in Monroe County. Hagan gave Smith the axe handle and dropped him off near the first home, which he was unable to enter. Smith continued walking down the road toward Howard's trailer and Hagan parked her vehicle on the side of the road, where the father of the county sheriff later observed it. Smith was familiar with Howard's trailer, as Hagan had purchased drugs there before while Smith waited in the car. After parking, Hagan ran toward the trailer and, from the doorway, she observed Howard slumped over. Smith was angry with Hagan for entering the trailer and hit her in the leg with the axe handle. Hagan also testified that she saw Howard, though injured, stab Smith in the stomach with the cane sword. Smith then beat Howard with the axe handle, stabbed her multiple times with a kitchen knife, and stole her purse. Smith and Hagan then drove away

from the trailer, changed clothes, rummaged through Howard's purse to find pills, and Smith clipped and cleaned his fingernails.

At trial, the Commonwealth's case was based primarily on Hagan's testimony. It also relied upon several letters written to police by another inmate, and friend of Smith, Jason Copas. Copas claimed Smith confessed to the murder and included details in the letters not known to the public. But when testifying, Copas said he made it all up. Based upon the evidence, the jury found Smith guilty of all charges. After his conviction was affirmed on appeal, Smith filed an RCr 11.42 motion which the trial court denied without holding an evidentiary hearing. This appeal followed.

## STANDARD OF REVIEW

"At the trial court level, '[t]he burden is upon the accused to establish convincingly that he was deprived of some substantial right which would justify the extraordinary relief afforded by . . . RCr 11.42.'" *Brown v. Commonwealth*, 253 S.W.3d 490, 500 (Ky. 2008) (citation omitted). "On appeal, the reviewing court looks *de novo* at counsel's performance and any potential deficiency caused by counsel's performance." *Id.* (citations omitted).

## ANALYSIS

Smith argues the trial court erred in denying him an evidentiary hearing on his ineffective assistance of counsel claims. "An evidentiary hearing

under RCr 11.42(5) is required only when there is a material issue of fact that cannot be determined on the face of the record." *Commonwealth v. Searight*, 423 S.W.3d 226, 231 (Ky. 2014) (internal quotation marks and citation omitted). Where no evidentiary hearing is held, appellate review "is limited to determining whether the motion on its face states grounds that are not conclusively refuted by the record and which, if true, would invalidate the conviction." *Id.* (internal quotation marks and citations omitted).

To establish ineffective assistance of counsel the "defendant must show that: (1) trial counsel's performance was deficient, and (2) trial counsel's deficient performance prejudiced him." *Ford v. Commonwealth*, 628 S.W.3d 147, 156 (Ky. 2021) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Commonwealth v. McKee*, 486 S.W.3d 861, 868 (Ky. 2016) (citation omitted). The question is: "absent counsel's errors, would the factfinder have had a reasonable doubt respecting guilt?" *Brown*, 253 S.W.3d at 499 (citation omitted). "To see if the factfinder would have had reasonable doubt, the court must review the evidentiary record available to the judge or jury." *Id.* (citation omitted).

Smith first argues counsel was ineffective for failing to object to the Commonwealth's improper comments on witnesses' truthfulness. In its opening argument, the prosecutor stated:

> As far as Chasity Hagan was concerned, after John Smith was detained, she was placed in a police car with [the detective]. At that point in time, you need to remember this, you'll hear from Chasity Hagan, Mr. Smith had made threats against Ms. Chasity Hagan, about her, her mother, and her son about things he would do to them if she told anything that's happened. But *after he was detained, and she was placed in the car with Detective Burton, she began to partially tell the truth in this case*. And she told Burton that the two of them had been to [the victim]'s home.
>
> . . . .
>
> And Chasity Hagan's going to come in here and testify and you're going to get to determine whether she's telling the truth. That's your all's job – to determine who's telling the truth in this case, and who's not. But *she will tell you that, based on the interviews that she gave after she entered the plea and the corroborating evidence with the lab reports and other witnesses, we're going to believe that this is what happened on the night of April the 20th*.

(Emphasis added.)

Smith contends the prosecutor's statements "after [Smith] was detained . . . [Hagan] began to partially tell the truth in this case" and "based on the interviews that [Hagan] gave after she entered the plea . . . we're going to believe that this is what happened on the night of April the 20th" amounted to

-6-

impermissible vouching for Hagan as a witness. He argues this vouching was compounded when the prosecutor asked during Hagan's direct testimony: "Is it okay if I call you Chasity? Because I have known you about all of your life."

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness." *Hall v. Commonwealth*, 551 S.W.3d 7, 18 (Ky. 2018) (quoting *United States v. Francis*, 170 F.3d 546 (6th Cir. 1999)). "Generally, improper vouching involves either blunt comments, such as, 'I think [the witness] was candid. I think he is honest,' or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Id.* (citations omitted).

Here, the prosecutor's statements do not fit in either category. Instead, they simply alerted the jury that Hagan's credibility would be a central issue in the case. Before her plea deal, Hagan had given five other statements that somehow contradicted her most recent one. The prosecutor's comment was an attempt to explain to the jury why Hagan's most recent statement (and presumably her trial testimony) differed from her previous ones. Notably, the prosecutor reminded the jury that it was their job "to determine who's telling the truth in this case, and who's not" and that they would get to decide if Hagan was telling the

-7-

truth.  No improper vouching occurred.  Additionally, the prosecutor's comment that he has known Hagan her entire life did not, by itself, serve to bolster Hagan's credibility.  Because the prosecutor's comments were not improper vouching, Smith's counsel was not ineffective for failing to object.  *See Commonwealth v. Davis*, 14 S.W.3d 9, 11 (Ky. 1999), *as modified* (Jan. 20, 2000) ("[I]f the record does not support the conclusion that the objection should have been sustained, then there can be no ineffective assistance of counsel for failing to object.").

Smith also challenges the Commonwealth's statement during closing argument that "[w]itnesses can lie.  Lord knows you heard enough of that from the last bunch that was paraded up here in front of you."  "It is unquestionably the rule in Kentucky that counsel has wide latitude while making opening or closing statements."  *Brewer v. Commonwealth*, 206 S.W.3d 343, 350 (Ky. 2006).  "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position."  *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987).  "And we have long recognized that it is permissible for prosecutors to comment on the veracity or credibility of witnesses."  *Dickerson v. Commonwealth*, 485 S.W.3d 310, 332 (Ky. 2016) (citation omitted); *see also Cavins v. Commonwealth*, 272 S.W.2d 656, 657 (Ky. 1954).  When addressing issues raised during closing, we must consider the closing argument "as a

whole." *Miller v. Commonwealth*, 283 S.W.3d 690, 704 (Ky. 2009) (internal quotation marks and citation omitted).

Here, the prosecutor's comment was not improper but a permissible comment on the evidence. Smith produced multiple witnesses that testified to his habit of biting his nails, as opposed to Hagan's testimony that he cut his nails following the murder. These witnesses also testified that Smith was stabbed by Hagan several days before the murder, contradicting Hagan's testimony that the victim stabbed Smith in self-defense. The prosecutor's passing comment that "witnesses can lie. Lord knows you heard enough of that from the last bunch that was paraded up here in front of you[,]" was a reasonable inference based upon the evidence and a proper comment on the veracity of defendant's witnesses.

Further, in context, the prosecutor's comment was directed more towards the strength of the Commonwealth's evidence and Hagan's truthfulness than the weakness or untruthfulness of Smith's witnesses. Here is the full statement:

> [Hagan] told you that when they left, got up that morning, and all the trips that they had made, they did not have any Xanax. They had taken some meth at about three am, and she had taken a diet pill, but they were out, she said, and they had no Xanax, either of them. They did not stop at any drug stores; they did not stop at any doctor's office, they only stopped at Brenda Howard's that night. And what [did she tell you,] that [Smith] got that purse with the Xanax in it . . . with the prescription for Brenda Howard. And when they got back out to

-9-

[Hagan]'s mother's trailer, that [Smith] went through it, took the pills out and took a handful of the Xanax. Now, this is important, she said: "I didn't take any." And now, look, she is an addict, and was then, and she admitted it freely. But she didn't take any. But what – and this is important because it shows, exactly, she is telling the truth – the next day when they took blood from both of them, what did they find in John Smith's blood stream? They found meth and, lo and behold, they found Xanax. The only place that day he could have gotten those Xanax is by killing Brenda Howard there in her humble trailer. Now these are facts ladies and gentlemen, some of them circumstantial, but witnesses can lie. And lord knows you heard enough of that from that last bunch that was paraded up here in front of you. . . . Witnesses can lie but circumstances don't. They are what they are. So, that Xanax and blood, circumstance, or fact, it is a fact. John Smith had Xanax, [Hagan] didn't. Just as she told you.

Considering the closing argument as a whole, we find no error.

Even assuming the comment was error and Smith's counsel ineffective for failing to object, Smith has not shown prejudice. The Commonwealth's closing argument was twenty-four minutes long, primarily focusing on the facts supporting Hagan's testimony and Jason Copas' statement. Any prejudice from the prosecutor's brief reference to witnesses lying was minimal. Further, while the evidence in the case was circumstantial, it was convincing. Jason Copas' statements corroborated Hagan's testimony. Though Copas testified he fabricated the statements, certain details of his account of the murder, primarily that Smith tore (or cut) his fingernails off to mid-nail, could have

-10-

come only from Smith. J.B. Hammer, the nurse who took DNA from Smith's fingernails, testified that "one-fourth to one-half of [Smith's] nail was gone from the fingertip back." We cannot say that the "decision reached would have been reasonably likely to be in [Smith's] favor absent the error[]." *Brown*, 253 S.W.3d at 500 (citation omitted).

Smith next argues counsel was ineffective for failing to review and object before trial to video deposition footage that showed him in prisoner attire. In its case-in-chief, the Commonwealth played the video deposition of Dr. Tracey Corey, the medical examiner, who explained the victim's injuries through autopsy photos. The deposition was recorded in the courtroom, with Dr. Corey at the witness stand and counsel asking questions from the podium. Most of the time the camera was fixed on Dr. Corey or the autopsy photos, but occasionally it would jump to counsel and Smith could be seen in the background, at counsel's table, in an orange jumpsuit.

Several minutes into the video, Smith's counsel objected to the jury seeing Smith in prisoner attire. The trial court overruled the objection, stating that counsel should have reviewed the video before trial. It held that the video was not prejudicial as Smith was in the distance and jurors could likely not even tell it was him. Even if they could, they knew he had been arrested and had worn an orange jumpsuit at some point.

Assuming counsel's failure to review the video and object before trial was ineffective assistance, Smith has not shown prejudice. In *Deal v. Commonwealth*, 607 S.W.3d 652, 667 (Ky. 2020), our Supreme Court held that playing for the jury a video interview depicting defendant handcuffed and in orange jail attire violated his due process rights. Although the analysis was different, as *Deal* involved a direct appeal rather than a collateral attack, the Court concluded that "the video was prejudicial based on specific circumstances of Deal's case[.]" *Id.* at 667.

However, in that case, the video was thirty-five minutes long, Deal was the focus of the interview and could be seen in jail attire the entire time. Here, most of the forty-one-minute video focused on Dr. Corey. Smith could be seen for less than ten minutes. Further, unlike Deal, who was handcuffed and interviewed in a jail cell, Smith was barely visible in the background of the video, sitting at counsel's table. The facts in this case are more like those in *Tennessee v. Taylor*, 240 S.W.3d 789, 791 (Tenn. 2007), distinguished by our Supreme Court in *Deal*. In *Taylor*, the Tennessee Supreme Court held allowing the jury to see a seven-minute video of the defendant in custody and jail attire did not violate his due process rights. We cannot say the less than ten-minute video of Smith in the background in jail attire "caused the defendant to lose what he otherwise would probably have won[,]" *Brown*, 253 S.W.3d at 499 (citation omitted), or was so

-12-

prejudicial "that defeat was snatched from the hands of probable victory." *Id.* (citation omitted).

However, we agree Smith is entitled to an evidentiary hearing on his last allegation of ineffective assistance of counsel – that counsel failed to investigate his alibi defense. Smith contends that he made three to five calls to a woman, Loretta Decker, from inside Hagan's residence during the time of the murder. He argues counsel was ineffective for failing to investigate this defense by obtaining phone records that would corroborate his alibi. Smith maintains "the record is wholly devoid of any evidence regarding whether trial counsel investigated this information, what he learned, and what decision he may have made regarding whether any of this evidence should be presented to the jury."

"Under *Strickland*, counsel has an affirmative duty to conduct reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Commonwealth v. McGorman*, 489 S.W.3d 731, 743 (Ky. 2016) (citation omitted). "The reasonableness of counsel's investigation depends on the circumstances of the case." *Hodge v. Commonwealth*, 68 S.W.3d 338, 344 (Ky. 2001), *as modified on denial of reh'g* (Mar. 21, 2002) (citation omitted).

Here, the trial court's order did not even address this claim of ineffective assistance.[3] It does not appear it determined whether trial counsel conducted any investigation into Smith's alibi. If there was no investigation, counsel's performance may have been deficient. Because the record does not dispute Smith's claim that counsel failed to investigate his alibi, an evidentiary hearing is necessary to determine if not introducing alibi evidence was trial strategy or ineffective assistance. If counsel's performance was deficient, the court must determine if Smith was prejudiced. "Before any possible [alibi] evidence can be weighed in a meaningful manner, that evidence first must be determined and delineated. This is the proper function of an evidentiary hearing." *Hodge*, 68 S.W.3d at 345.

## CONCLUSION

Based upon the foregoing, the Monroe Circuit Court's order denying Smith's RCr 11.42 motion is affirmed in part, vacated in part, and we remand this matter for the court to hold an evidentiary hearing on the issue of ineffective assistance of counsel as it relates to trial counsel's not introducing evidence of Smith's alibi.

---

[3] The trial court's order only addressed the claims of ineffective assistance in Smith's counsel's supplemental RCr 11.42 motion. It did not address any of the claims of ineffective assistance in Smith's *pro se* RCr 11.42 motion, incorporated by reference in counsel's supplemental motion. Smith's ineffective assistance claim concerning his trial counsel's failure to investigate his alibi was presented in his *pro se* motion.

ALL CONCUR.


BRIEFS FOR APPELLANT:          BRIEF FOR APPELLEE:

Aaron P. Riggs                 Russell Coleman
La Grange, Kentucky            Attorney General of Kentucky

                               Joseph A. Beckett
                               Assistant Attorney General
                               Frankfort, Kentucky